# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

**DEBRA ANN ELLIOTT[1],**

   **Plaintiff,**

**v.**                                              **Case No:  2:12-cv-272-FtM-38DNF**

**COMMISSIONER OF SOCIAL
SECURITY,[2]**

   **Defendant.**

---

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause is before the Court on Plaintiff's Complaint (Doc. 1) filed on May 6, 2012. Plaintiff, Debra A. Elliot, seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her claim for Social Security Disability Insurance Benefits and Supplemental Security Income disability benefits.  The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions. For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **Affirmed in part and Reversed and Remanded in part** pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

---

1  Both Plaintiff's Memorandum in Support of the Complaint (Doc. 16) and the Commissioner's Memorandum in Support of the Commissioner's Decision (Doc. 19) spell Plaintiff's name as "Elliot," however, the Complaint (Doc. 1), and most if not all of the documents that are part of the Administrative Report spell Plaintiff's name as "Elliott."  The Court will use the spelling of Plaintiff's name from the Complaint.

2  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. FED. R. CIV. P. 25(d).  No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

## I.  Social Security Act Eligibility, the ALJ Decision, and Standard of Review

### A.  Eligibility

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1)(A), 1382(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382(a)(3); 20 C.F.R. §§ 404.1505-404.1511, 416.905-416.911.  Plaintiff bears the burden of persuasion through step four, while at step five the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987).

### B.  Procedural History

On June 22, 2006, Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Security Income asserting a disability onset date of February 1, 2006.  These claims were denied initially on October 18, 2006, and denied upon reconsideration on February 9, 2007.  A video hearing was held before Administrative Law Judge Irwin Bernstein on April 17, 2009, and ALJ Bernstein issued an unfavorable decision on May 19, 2009.  On October 2, 2009, the Appeals Council denied Plaintiff's request for review.  The Plaintiff filed a Complaint in the United States District Court and on May 26, 2010, the District Court remanded the case back to the Commissioner for further administrative proceedings.

On September 1, 2011, the remand hearing was held and on October 28, 2011, Administrative Law Judge Larry Butler ("ALJ") rendered an unfavorable decision.  Plaintiff

requested review of the ALJ's decision, but the Appeals Council denied review on April 18, 2012.  Plaintiff filed the instant action in federal court on May 16, 2012.

### C.  Summary of the ALJ's Decision

The ALJ found Plaintiff met the Social Security Act's insured status requirements through December 31, 2009. (Tr. p. 595).  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2006. (Tr. p. 597). At step two, the ALJ found that the Plaintiff suffered from the severe impairments of "disorders of the back, status post cervical fusion, with diagnosis of cervical fusion syndrome and cervical facet syndrome."  (Tr. p. 597).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926).  (Tr. p. 597).   The ALJ found Plaintiff's mental impairments caused mild restrictions in activities of daily living, mild limitations in social functioning, and mild limitations in concentration, persistence or pace.  (Tr. p. 597-98).  The ALJ found no episodes of decompensation of an extended duration. (Tr. p. 598). At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work except that Plaintiff should only lift/carry up to 10 pounds occasionally; Plaintiff requires a sit/stand option; Plaintiff can only occasionally bend and squat; and Plaintiff can never crawl or climb.  (Tr. p. 599). At step four, the ALJ found the Plaintiff is able to perform her past relevant work as a clerical worker.  (Tr. p. 602).  The ALJ concluded that Plaintiff was not disabled as of February 1, 2006.  (Tr. p. 603).

### D.  Prior Remand

On May 24, 2010, this Court entered an Order (Doc. 18) in Plaintiff's prior District Court

case, 2:09-cv-727-FtM-DNF which remanded this matter to the Commissioner upon agreement

of the parties.  The matter was remanded as follows:

> So that an administrative law judge (ALJ) may further evaluate the case and issue
> a new administrative decision.  On remand, an ALJ will be directed to take the
> following action:  (1) evaluate the medical source opinions of record from treating
> source Dr. Liebowitz, specifically state the weight given to these opinions, and
> specifically set forth the reasons for that weight; (2) address evidence which has
> been received in connection with subsequent applications that were filed effective
> June 18, 2009; and (3) if warranted, obtain evidence from a vocational expert.

(Tr. p. 636).

### E.  Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the

correct legal standard, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether

the findings are supported by substantial evidence, *Richardson v. Perales,* 402 U.S. 389, 390

(1971).  The Commissioner's findings of fact are conclusive if supported by substantial

evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla; i.e., the evidence

must do more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the conclusion.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835,

838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district

court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and

even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

*Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356,

1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote,* 67 F.3d at 1560; *accord,* *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (providng that a court must scrutinize the entire record to determine reasonableness of factual findings).

## II.  Review of Facts and Conclusions of Law

### A.  Background Facts

Plaintiff was born on October 22, 1968.  (Tr. p. 614), and was forty-two years old on the date of the second hearing.  (Tr. p. 614).  She graduated high school.  (Tr. p. 614).  She received vocational training at the Criminal Justice Academy for three months.  (Tr. p. 614-615).  She has a 17-year-old minor child who is living with her.  (Tr. p. 615).  She resides with her father who has dementia.  (Tr. p. 615, 632).  She drives approximately one to two times per day, taking her son to school.  (Tr. p. 616).  Her past work included being a secretary, well drilling, a driver, and a cleaner.  (Tr. p. 616).

Plaintiff testified that she stopped working because her pain became so bad that she was undependable.  (Tr. p. 617).  She has pain in her low back, and it radiates up and down her legs and arms, and is everywhere.  (Tr. p. 617).  Plaintiff testified that the pain has progressively gotten worse since 2005.  (Tr. p. 617).  Plaintiff testified that she has severe carpal tunnel syndrome in both arms, but has not had surgery.  (Tr. p. 618-619).  According to Plaintiff, the pain in her arms worsens at night and comes and goes.  (Tr. p. 619).  She has trouble sleeping due to her arm pain.  (Tr. p. 628). Plaintiff contends that she has neck pain that radiates down her arms and also causes headaches.  (Tr. p. 619, 620).   Being on the telephone exacerbates her neck pain.  (Tr. p. 619-620).

Plaintiff testified that her back pain is constant, but not so severe that she is unable to get up and get dressed.  (Tr. p. 620).  However, Plaintiff contends that her back pain increases when she bends and squats, stands for long period of time, and she is unable to climb stairs. (Tr. p. 620, 630).  Lying down is Plaintiff's most comfortable position.  (Tr. p. 621). Plaintiff also testified that she had pain in her ankles, but has not been diagnosed with any ailment there.  (Tr. p. 621).  Her foot had been run over by a car in 2008.  (Tr. p. 622).

Plaintiff had neck surgery, and she goes to pain management.  (Tr. p. 622). Her treatment included epidural injections which helped for a period of time, she has attended physical therapy, and saw a chiropractor.  (Tr. p. 622-623).   She is taking oxycodone, and has tried other medications.  (Tr. p. 623).   Plaintiff testified that her side effects from the medication are depression, weight loss, irritability, and fatigue.  (Tr. p. 623).  Plaintiff testified she gets dizzy from the medication.  (Tr. p. 625).

Plaintiff testified that she takes no medication for depression.  (Tr. p. 626).  She has a pretty good memory, but does forget dates, and has been told that she has ADD, based on her problems focusing and concentrating.  (Tr. p. 626).  Plaintiff testified she smokes half a pack of cigarettes a day.  (Tr. p. 627).  Plaintiff naps more than once a day.  (Tr. p. 628).

Plaintiff takes care of her personal needs.  (Tr. p. 628) Her children help her to get up and down, carry things, and they clean the household.  (Tr. p. 628-629). Plaintiff testified she could carry less than 5 pounds, drops things often, and can only write for a little while. (Tr. p. 629). On a typical day, Plaintiff drives her son to school, helps him with homework, reads, and watches television.  (Tr. p. 630).  She was prescribed a walker recently by her physician.  (Tr. p. 632).

On August 8, 2006, the Plaintiff completed a Function Report –Adult.  (Tr. p. 122-129). The Plaintiff wrote that she wakes her boys up for school, takes them to school, comes home and lies down for 1 to 2 hours, then straightens the house.  (Tr. p. 122).  She rests, and then picks up her boys from school, helps them with homework, gets them ready for the next day, and cooks dinner.  (Tr. p. 122). Plaintiff states that her arms hurt so bad she is unable to sleep for more than a few hours.  (Tr.  p. 123).  Her only problem with personal care is that she is unable to brush her own hair sometimes.  (Tr. p. 123).  She wrote that she prepares her own meals daily.  (Tr. p. 124).  She stated that she cannot stand for long periods of time or pick up heavy food.  (Tr. p. 124). Plaintiff was able to dust and do light household chores every day.  (Tr. p. 124). She is unable to do yard work.  (Tr. p. 125).  She did do food shopping, and handles her own funds. (Tr. p. 125).   She does go out to eat a lot.  (Tr. p. 126). She could walk for 5 to 10 minutes and then rest for a half an hour, and could pay attention as long as needed.  (Tr. p. 127).   She does not handle stress or change well.  (Tr. p. 128).

On August 8, 2006, the Plaintiff's mother also completed a Function Report – Adult – Third Party (Tr. P. 114-121).  Plaintiff's mother wrote that the Plaintiff takes care of her kids and straightens the house.  (Tr. p. 114).  Plaintiff's mother mentioned Plaintiff is unable to brush her own hair.  (Tr. p. 115).  Plaintiff's mother confirmed that Plaintiff prepared her own meals, but could not lift heavy dishes.  (Tr. p. 116).  Plaintiff also goes food shopping and shopping for her children.  (Tr. p. 117).  Her mother wrote that anything she does hurts her all over.  (Tr. p. 119). Plaintiff's mother stated that her attention and following written and spoken instructions was good.  (Tr. p. 119).

### B. Summary of Medical Evidence

Plaintiff included a great deal of medical evidence from years prior to her onset date. The Court reviewed all of the medical evidence provided by Plaintiff, however, the Court will include a brief summary of some of the medical evidence for the years prior to the onset date of February 1, 2006. From January 1, 1999 through January 1, 2000, Plaintiff occasionally visited Melanie Makar, MS, ARNP, C-FNP and Peter Lautenbach, D.O. (Tr. p. 174-178). Ms. Makar diagnosed Plaintiff with depression with recurrent situational anxiety, and prescribed medication and meetings with a mental health counselor. (Tr. p. 174, 177). Dr. Lautenbach diagnosed Plaintiff with new onset neck pain with bilateral arm pain and radicular type symptoms (Tr. p. 175).

From April 4, 2000, through February 28, 2002, the Plaintiff visited Rehabilitation Consultants. (Tr. p. 179-198). Plaintiff initially went to Rehabilitation Consultants for pain in her right elbow and right hip due to a slip and fall. (Tr. p. 193-194). She was given a prescription, and on a second visit an injection. (Tr. p. 191-194). Plaintiff returned to Rehabilitation Consultants for chronic cervical and lumbar myofascial pain management. (Tr. p. 181-185). Plaintiff was given injections and medication for the pain. (Tr. p. 181-185). On May 29, 2001, Plaintiff saw Douglas Savage, M.D. for bilateral arm pain, from a slip and fall injury (Tr. p. 273). Dr. Savage's impression was myofascial upper extremity pain and mild left C5-6, C6-7 neural foraminal stenosis. (Tr. p. 274). Dr. Savage determined that neurosurgical intervention was not indicated and recommended she continue with conservative management. (Tr. p. 274). Dr. Savage did not prescribe any medication for Plaintiff. (Tr. p. 274). Plaintiff also saw John C. Kagan, M.D. on August 3, 2001 for right hip pain, and Dr. Kagan suggested she continue taking Advil. (Tr. p. 227).

Plaintiff also visited Cape Coral Hospital on February 1 and 11, 2001, for arm pain.  (Tr. p. 693-694).  Plaintiff was prescribed medication.  (Tr. p. 693-694).

On March 10, 2002, Plaintiff went to Cape Coral Hospital for neck pain caused by a car accident.  (Tr. p. 690).  Plaintiff was given a prescription for pain medication.  (Tr. p. 690-691). On June 18, 2002, Plaintiff went to Cape Coral Hospital to obtain additional pain medication. (Tr. p. 689).  Plaintiff was given Neurontin and told to follow-up with her doctor for narcotic pain medication.   (Tr. p. 689-690).  On August 27, 2002, Plaintiff went to Cape Coral Hospital complaining of right arm pain.  (Tr. p. 688).   She was out of her prescription and wanted additional medication.  (Tr. p. 688).  Plaintiff was discharged and told to contact her doctor for refills.  (Tr. p. 688). On October 29, 2002, Plaintiff went to Family Health Center for painful teeth and blood work.  (Tr. p. 199). Plaintiff was diagnosed with chronic teeth pain, bulimia and depression.  (Tr. p. 199).

On April 2, 2003, Plaintiff saw Harris L. Bonnette, M.D. for a neurological examination. (Tr. p. 203).  Dr. Bonnette found that Plaintiff had a history of chronic pain complaints, however her neurologic and orthopedic examinations were entirely normal, and he found no structural cause of her pain.  (Tr. p. 205).  Dr. Bonnette recommended no further testing and that Plaintiff be placed on non-narcotic pain management and he projected that "she will be challenging to manage."  (Tr. p. 206).  On May 20, 2003, and on June 6, 2003, Plaintiff went to Cape Coral Hospital for pain in her left arm and shoulder from a rollerblading accident.  (Tr. p. 683-685). Plaintiff was initially given a sling, and on her second visit told to go home and rest and given a prescription.  (Tr. p. 684, 685).

On September 15, 2003, Plaintiff went to Cape Coral Hospital for neck pain, and was told that the hospital does not provide chronic pain management and to see her doctor.  (Tr. p. 679-

680).  On September 29, 2003, Plaintiff was diagnosed with bilateral cervical radiculopathy with evidence of central disc herniation at C5-6 and C6-7 by Wesley H. Faunce, Ph.D., M.D.  (Tr. p. 268).  On October 29, 2003, Plaintiff had her anterior cervical discectomy and fusion ("ACDF") surgery.  (Tr. p. 267).  Plaintiff was doing much better after surgery and only had pain in the left trapezius into the proximal left arm.  (Tr. p. 264).  Plaintiff was given medication for the pain and referred to pain management.  (Tr. p. 264).  Beginning on December 29, 2003, Plaintiff stated she had unbearable pain in her right arm, and Dr. Faunce's office recommended an MRI and EMG nerve conduction study, and to wean herself off the pain medication.  (Tr. p. 256 – 259).

On January 12, 2004, Plaintiff went to Cape Coral Hospital for neck pain, and on January 14, 2004, Plaintiff returned for chronic neck pain and a medication reaction.  (Tr. p. 677-679).  Plaintiff was given a prescription.  (Tr. p. 678).  On February 12, 2004, her neck was feeling better, but her right hand had a tremor.  (Tr. p. 252).  On March 22, 2004, Plaintiff went to Dr. Faunce for severe left carpal tunnel syndrome.  (Tr. p. 248).  The EMG./nerve conduction study showed the carpal tunnel was severe.  (Tr. p. 248).  Dr. Faunce offered to relieve the symptoms with a left carpal tunnel release.  (Tr. p. 248).  On August 3, 2004, Plaintiff went to Cape Coral Hospital for back pain, and was prescribed medication.  (Tr. p. 677).  On September 12, 2004, Plaintiff went to Cape Coral Hospital for back pain.  (Tr. p. 675). She was prescribed medication.  (Tr. p. 676). On September 13, 2004, Plaintiff went to Cape Coral Hospital for low back pain which was exacerbated by pulling on a heavy tree.  (Tr. p. 674).  Plaintiff was prescribed medication.  (Tr. p. 675).  On September 30, 2004, Plaintiff had a Magnetic Resonance Imaging ("MRI") of the lumbar spine. (Tr. p. 287). Jeff Bisker, M.D. had the following impression: "posterior protrusion of the L5-S1 disc laterally on the right encroaching on the right neural

foramina and lateral recess.  . . . mild posterior bulging of the L4-L5 disc on the left with facet hypertrophy and some encroachment on the neural foramen and lateral recess.   No other abnormality." (Tr. p. 288).

On January 7, 2005, Plaintiff went to Cape Coral Hospital for falling and having neck pain and injuring her thumb.  (Tr. p. 673).  After x-rays, Plaintiff's thumb was placed in a splint and sling, and told to follow up her neck pain with Dr. Faunce.  (Tr. p. 674). On February 4, 2005, Plaintiff had an MRI Cervical Spine With and Without Contrast test.  (Tr. p. 279-280). Chris J. Marino, M.D. concluded that at C3-4, there is a minor broad based disc bulge that had increased since January 23, 2004, at C5-6, there is fusion at this level with minor narrowing of the foramen, at C6-7, there is fusion of the vertebrae at this level with minor broad based disc bulge and osteophyte and minor narrowing of the left neural foramen.  (Tr. p. 279).

On August 17, 2005, Plaintiff visited Rodolfo Gari, M.D complaining of neck pain that radiated to her lower extremities.  (Tr. p. 552). On August 23, 2005, Plaintiff received a Left cervical facet joint injection. (Tr. p. 311-312, 551). August 29, 2005,  Plaintiff saw Dr. Gary for cervical pain that radiated to her shoulders and arms with tingling and numbness.  (Tr. p. 548-549).  On September 14, 2005, and October 12, 2005,  Plaintiff returned to Dr. Gari for neck, lower back, shoulder, wrist and hand numbness/pain, and Dr. Gary prescribed medication.  (Tr. p. 562-563).   On November 9, 2005, Plaintiff received a cervical epidural steroidal injection. (Tr. p. 310), Dr. Gari saw her again on November 15 and 18, 2005.  On November 23, 2005, Plaintiff went to Cape Coral Hospital after hitting her head and having headaches.  (Tr. p. 671). After an x-ray, Plaintiff was given medication and discharged.  (Tr. p. 672).

On November 29, 2005, Plaintiff went to the Family Medical Clinic and saw Rajan Sareen, M.D.  (Tr. p. 386).  Plaintiff complained of neck pain.  (Tr. p. 386).  Dr. Sareen provided

medication and referred her to pain management.  (Tr. p. 386).  On December 9, 2005, Plaintiff saw Dr. Sareen for pain, and requested medication refills.  (Tr. p. 385).  Dr. Sareen provided the medication.  (Tr. p. 383-385).  On December 13, 2005, Dr. Gari administered a cervical epidural steroid injection.  (Tr. p. 544).

On December 16, 2005, and January 12, 2006, Plaintiff went to the Armenia Surgery Center, and saw Dr. Gari for various complaints of neck, hip, lower back and wrist pain. (Tr. p. 308, 521).  Dr. Gari's plan was for left cervical facet join injections.  (Tr. p. 309).  On January 9, 2006, and February 8, 2006, Plaintiff saw Dr. Sareen for pain, and requested medication refills. (Tr. p. 385).  Dr. Sareen provided the medication.  (Tr. p. 383-385).  On December 13, 2005, Dr. Gari gave Plaintiff a cervical epidural steroid injection.  (Tr. p. 522).

On February 13, 2006, Plaintiff returned to Armenia Surgery Center complaining of cervical pain that radiates bilaterally to her legs, and feet.   (Tr. p. 306).  Physical therapy was recommended, and Motrin and Roxicodone were prescribed.  (Tr. p. 306).

On February 16, 2006, Plaintiff visited Kenneth A. Berdick, M.D. complaining of bilateral carpal tunnel syndrome and neck pain. (Tr. p. 292).  Dr. Berdick's assessment was that her carpal tunnel syndrome was under relatively good control with her current medications, and her neck pain syndrome was not apparent during her examination.  (Tr. p. 292).  Her grip strength, finger dexterity, and gait were normal. (Tr. p. 293).  All joints including her neck had a full range of motion.  (Tr. p. 293).  Dr. Berdick questioned her that in light of all of her complaints, why did Plaintiff have calluses on her hands, and she had no response.  (Tr. p. 293). Dr. Berdick opined that "[g]iving her the benefit of the doubt, activities involving heavy lifting, bending and carrying may very well exacerbate her clinical syndrome, but it appears that under

normal circumstances, she appears reasonably functional concerning the activities of daily living including housekeeping, cooking, taking care of her two children and driving." (Tr. p. 293).

February 17, 2006, Plaintiff returned to Dr. Gari who performed a left cervical facet joint injection procedure. (Tr. p. 305). Plaintiff went to Armenia Surgery Center on February 21, 2006, March 13, 2006 and April 13, 2006. (Tr. p. 301-305). On March 13, 2006, Robert Guirguis, DO determined that Plaintiff's medications should be renewed, and that further injections should be held off; and on April 13, 2006 and May 10, 2006, Plaintiff's prescriptions were renewed. (Tr. p. 301). On June 9, 2006, Dr. Guirguis required Plaintiff take a urine test, and on June 22, 2006, Plaintiff was discharged from Dr. Guirguis for failing to take her urine test and confessing to using marijuana. (Tr. p. 294-296, 314).

Plaintiff visited the Family Medical Clinic on March 9, 2006, April 10, 2006, May 10, 2006, June 8, 2006, July 7, 2006, September 29, 2006, August 2, 2006, October 30, 2006, December 27, 2006, and January 24, 2007, complaining of hand pain, and then later back pain, and requesting medication. (Tr. p. 373-389). Rajan Sareen, M.D. provided pain medication. (Tr. p. 373-389).

On July 10, 2006, Plaintiff went to Fred Liebowitz, M.D. at the Headache & Pain Management Center of Southwest Florida, complaining of severe neck pain which radiates into the interscapular region and down into both hands. (Tr. p. 490-495). Dr. Liebowitz's impression was that Plaintiff suffers from cervical post-laminectomy syndrome, cervical facet syndrome/cervical spondylosis, and cervical myofascial pain syndrome. (Tr. p. 491-492). Dr. Liebowitz prescribed medication and had Plaintiff maintain an off-duty work status until treatment could be completed. (Tr. p. 492).

On August 7, 2006, Plaintiff saw Dr. Liebowitz complaining of severe neck pain which radiated into her hands and severe headaches, and Dr. Liebowitz prescribed pain medication for her. (Tr. p. 487). On September 5, 2006, Dr. Liebowitz gave Plaintiff a cervical epidural steroid injection. (Tr. p. 478-484). On October 3, 2006, Plaintiff returned to Dr. Liebowitz stating that she had short-term relief from the cervical epidural steroid injection, but after 24 hours she was experiencing the same severe pain radiating from her neck down to her hands. (Tr. p. 477). Medicaid would not pay for Oxycotin, so Plaintiff switched to Oxycodone. (Tr. p. 477). Dr. Liebowitz ordered an MRI with and without contrast. (Tr. p. 477). On October 17, 2006, Plaintiff had an MRI and the radiologist determined the following: at C3-C4, there was a mild broad annulus bulge producing mild bilateral foraminal and central canal stenosis; at C4-C5, the disc space was narrow and the disc was desiccated, and there was a mild central disc protrusion slightly encroaching the thecal sac; at C5-C6 there was a mild bulging annulus and left uncovertebral osteophyte producing moderate stenosis of the left neural foramen. (Tr. p. 474). On October 31, 2006, Plaintiff went to Dr. Liebowitz stating that her pain persisted. (Tr. p. 472). Dr. Liebowitz found Plaintiff using her medication with good response, and Dr. Liebowitz recommended another steroid injection and refilled Plaintiff's pain medications. (Tr. p. 472). On November 28, 2006, Plaintiff told Dr. Liebowitz that she continued to have neck pain and described a "shock-like sensation which shoots down both upper extremities when she supinates the palms of both hands." (Tr. p. 470). Dr. Liebowitz renewed her pain prescriptions. (Tr. p. 470). On December 19, 2006, Dr. Liebowitz gave Plaintiff a cervical epidural corticosteroid injection. (Tr. p. 468). On January 15, 2007, Plaintiff returned to Dr. Liebowitz stating that she had a dispute with her pharmacist regarding her medication, and that the pain in her neck persisted but was reduced by 50%, she no longer had numbness in her fingertips, and the pain no

longer radiated down her arms.  (Tr. p. 466).  Dr. Liebowitz considered tapering Plaintiff's use of oxycodone.  (Tr. p. 466).  On February 2, 2007, Plaintiff returned to Dr. Liebowitz complaining that her neck pain was gradually intensifying, and her hands and fingertips were numb again. (Tr. p. 464).  Plaintiff had lumbago which radiated into her hips and thighs made worse by her lifting a table.  (Tr. p. 464).  Plaintiff found that the Oxycodone provided incomplete pain relief. (Tr. p. 64).   On March 2, 2007, Plaintiff saw Dr. Liebowitz with the same complaints, and Dr. Liebowitz adjusted her medications.  (Tr. p. 462).

On March 2, 2007, Dr. Liebowitz completed a motor deficit questionnaire.  (Tr. p. 173). Dr. Liebowitz found that Plaintiff had no motor deficit in her lower extremities, a motor strength of 3/5 in her left upper extremity, and a 4/5 in her right upper extremity. (Tr. p. 13).  Her bilateral grip strength was 4/5, and her ability to perform fine manipulation as limited after several minutes at any one activity. (Tr. p. 173). Dr. Liebowitz reported that she had a normal gait and station and was able to squat, walk on toes, and walk on heels.  (Tr. p. 173).

On March 23, 2007 and April 18, 2007, Plaintiff returned to the Family Medical Clinic with lower back pain, stiffness and spasms, and requesting a refill on pain medication. (Tr. p. 372).  Dr. Sareen provided medication.  (Tr. p. 372).

On March 27, 2007[3], April 20, 2007, May 29, 2007, July 2, 2007, August 2, 2007, August 30, 2007, September 27, 2007, October 25, 2007, November 21, 2007, December 19, 2007,  January 18, 2008, and February 15, 2008, Plaintiff went to Headache & Pain Management Center with continued neck pain and with the pain radiating down to her hands, and low back pain radiating to her hips and thighs.  (Tr. p. 435-460).[4]  Plaintiff stated that the medication

---

[3] The Progress Notes from Headache & Pain Management Center from various dates are not clearly legible.

[4] Plaintiff included a medical record purportedly from Kenneth Berdick, M.D. dated May 11, 2007; however, it is totally illegible.

worked to manage her pain.  (Tr. p. 435-460).  Her medications were adjusted and/or renewed. (Tr. p. 435-460).

On January 24, 2008, Dr. Liebowitz completed a Physical Capacity Evaluation finding that Plaintiff could not stand/walk at one time in an 8-hour work day, and could stand/walk throughout the day for 2 hours in an 8 hour workday.  (Tr. p. 392).  Dr. Liebowitz found Plaintiff could sit for one hour at a time in an 8-hour workday, and could sit for 4 hours throughout an 8-hour workday.  (Tr. p. 392).  Dr. Liebowitz determined Plaintiff can lift up to 10 pounds occasionally, could use her hands for grasping pushing, pulling and fine manipulation, and could use feet for repetitive movements in operating foot controls.  (Tr. p. 392-393).  Dr. Liebowitz determined that Plaintiff could bend and squat occasionally, and was not able to crawl or climb, but could reach above shoulder level.  (Tr. p. 393).

On January 24, 2008, Dr. Liebowitz completed "Interrogatories Pain."  (Tr. p. 394).  Dr. Liebowitz found Plaintiff's range of motion decreased in the cervical region with decreased rotation, and lateral flexion/extension with pain.  (Tr. p. 394).  "Patient also has myofascial hypertonicity with tenderness at the left sacral spine region."  (Tr. p. 394).  Dr. Liebowitz found all of these conditions could cause pain, and he stated that Plaintiff's "pain complaints exist in the affected areas and they are credible."  (Tr. p. 394).

On March 1, 2008, Plaintiff's foot was run over by a car and Plaintiff was transported to the hospital.  (Tr. p. 401).  X-rays were taken of her left foot, left knee, and lumbar which showed no factures.  (Tr. p. 396-400).   Plaintiff was discharged and placed in a postoperative shoe.  (Tr. p. 396).  On August 26, 2008, Plaintiff went to Scott Katzman, M.D. complaining of lower back pain, left knee pain, and left ankle pain from the car accident.  (Tr. p. 407).   Dr.

Katzman provided options to Plaintiff from rehab and conservative treatment to surgery. (Tr. p. 411).

On March 18, 2008, Plaintiff returned to Headache & Pain Management Center complaining of chronic neck and low back pain. (Tr. p. 434). Plaintiff also indicated she had panic attacks. (Tr. p. 434). On April 7, 2008, Plaintiff returned with neck and low back pain, and ankle pain. (Tr. p. 433).

On April 22, 2008, Plaintiff had an MRI Cervical Spine With and Without Contrast. (Tr. p. 427-431). The radiologist made the following findings: At the C2-3 disc level there was no evidence of disc protrusion; at C3-4 disc level, there was a mild disc bulge; at C4-5 disc level, there was a small posterior central disc protrusion without evidence of cord compression, with no significant change from prior study; at C5-6 disc level, post fusion, with no disc protrusion; at C6-7, disc level, post fusion, there was a desiccated disc and mild bulge; and at C7-T1 disc level, there was no evidence of disc protrusion. (Tr. p. 427). The radiologist's impression was post fusion at the C5-6 and C6-7 disc levels without disc protrusion, a stable posterior central disc protrusion at the C4-5 disc level without cord compression, and a C3-4 disc bulge. (Tr. p. 429).

On May 5, 2008, June 2, 2008, June 30, 2008, July 28, 2008, August 25, 2008, October 21, 2008, Plaintiff returned to Headache & Pain Management Center complaining of neck pain, low back pain, and on occasion ankle, and foot pain. (Tr. p. 413- 425). Plaintiff's medications were adjusted or renewed. (Tr. p. 413-425).

On March 11, 2010 and March 23, 2010, Plaintiff went to Lee Memorial Hospital complaining of back pain from a fall and was given prescriptions and discharged. (Tr. p. 713-715, 717-720). On April 21, 2010, Plaintiff went to Lee Memorial Hospital for back and hip pain. (Tr. p. 711- 712). Plaintiff was given prescriptions for pain medication. (Tr. p. 711-712).

Plaintiff was admitted to Lee Memorial Hospital on May 12, 2010 complaining of back pain after falling off her back step.  (tr. p. 703-707).  A chest x-ray and CT scan were ordered.  (Tr. p. 704).  The chest x-ray was negative and the CT scan of the lumbar spine showed an acute fracture of L3 transverse process, and an old left L-2 transverse process fracture. (Tr. p. 704).  Plaintiff was given a prescription for pain medication.  (Tr. p. 704).  On May 20, 2010, Plaintiff went to Lee Memorial Hospital for a fall and acute/chronic back pain.  (Tr. p. 698-701).  Plaintiff had x-rays of the LS spine which showed no acute fractures, and normal alignment, and the x-ray of the pelvis was negative.  (Tr. p. 698).  Plaintiff was given Percocet and Zofran, and discharged.  (Tr. p. 698-699).

On February 15, 2011, Plaintiff went to Cape Coral Hospital for back pain radiating down her right leg.  (Tr. p. 723-724).   Plaintiff claims to have lost her prior prescriptions for Tramadol, Ibuprofen, and Flexeril.  Plaintiff was given an injection, and given a prescription for Tramadol, Flexeril, and Ibuprofen and discharged.  (Tr. p. 723-724).  On May 27, 2011, and June 17, 2011, Plaintiff went to Physicians Wellness Center, however, the records are mainly illegible. (Tr. p. 732-737).

### C. Summary of Psychological Medical Evidence

On February 15, 2006, Plaintiff visited J. L. Bernard, J.D., Ph.D., ABPP, FACP, a Board Certified Clinical Psychologist.  (Tr. p. 289).  Her chief complaint was the pain in her neck, both arms, both hips, and her lumbar spine.   (Tr. p. 289) Plaintiff also mentioned bulimia and depression, claiming that she stays in bed for two or three days and cries.  (Tr. p. 289). Plaintiff claimed that she does have some control over her bulimia.  (Tr. p. 289). Dr. Bernard found Plaintiff's thought process to be rational, clear, and logical. (Tr. p. 290).  Her mood was stable and appropriate, and she was not on antidepressants at that time.  (Tr. p. 290).  Her insight and

judgment were probably average and he estimated her intellectual level to be average based on his observations alone.  (Tr. p. 290).  Plaintiff was well oriented for time and place and has no indications of cognitive dysfunction. (Tr. p. 290).  His diagnosis for Axis I was major depressive disorder, recurrent, mild and at Axis IV occupational and financial stressors were present.  (Tr. p. 290).  Plaintiff presented a GAF[5] score of 60, and was capable of handling her own finances. (Tr. p. 290-291).  Dr. Bernard's prognosis was guarded.  (Tr. p. 291).

On October 17, 2006, Plaintiff returned to Dr. Bernard complaining of pain in arms, hips, ankles, and shoulders and mentioned headaches[6].  (Tr. p. 317).  Dr. Bernard did note the following "[r]ecall, she drove herself to the interview in her mother's truck." (Tr. p. 317).  Dr. Bernard found Plaintiff's thought processes to be good for the most part, but found it odd that she did not know her age.  (Tr. p. 318).  Her mood was stable and appropriate and he estimated her intellectual level to be average based on his observations.  (Tr. p. 318).  He found her judgment and insight to be average with no cognitive dysfunction.  (Tr. p. 319).  Dr. Bernard's diagnosis was in Axis I, major depressive disorder, recurrent, Axis II R/O obsessive-compulsive disorder, and in Axis IV not social, occupational and financial stressors.  (Tr. p. 319).  Dr. Bernard found Plaintiff's GAF score to be 55, that Plaintiff could handle finances, and a prognosis of guarded.  (Tr. p. 319).

### D. State Agency Evaluations

On October 18, 2006, Martha Putney Ph.D. completed a Psychiatric Review Technique. (Tr. p. 320-333).   Dr. Putney determined Plaintiff had medical impairment(s) that were not

---

5 A GAF score of 60 indicates only moderate symptoms.  *Wilson v. Astrue,* 653 F.Supp.2d 1282, 1295 (M.D. Fla. Sept. 3, 2009).  The Commissioner does not endorse GAF scores in social security disability cases because they have no "'direct correlation to the severity requirements of the mental disorders listings.'"  *Wind v. Barnhart*, 133 F. App's 684, 692 n. 5 (11th Cir. 2005) (internal citation omitted).

6 Dr. Bernard noted that she only mentioned headaches when he asked about them even though she had them 2 or 3 times a day for 90 minutes. (Tr. p. 317).

severe, and had affective disorders.  (Tr. p. 320).  Dr. Putney found Plaintiff to have a medically determinable impairment of depression.  (Tr. p. 323).  Dr. Putney determined that Plaintiff had no functional limitations for restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild limitations in maintaining concentration, persistence, or pace and no episodes of decompensation of an extended duration.  (Tr. p. 330).  Dr. Putney found Plaintiff to have no mental impairment, and that Plaintiff was able to prepare meals, shop, take care of herself, take care of her children, do household chores, manage money, and drive as physical limitations permit. (Tr. p. 332).  Plaintiff's social abilities were mildly decreased, but she got along adequately with the public and authorities, and was appropriate and cooperative. (Tr. p. 332).

On October 18, 2006, a Physical Residual Functional Capacity Assessment was completed by Jacqueline N. Chamberlain[7].  (Tr. p. 334-341).  Ms. Chamberlain determined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and was unlimited in the push and/or pull operation for hand and/or foot controls.  (Tr. p. 335).  Ms. Chamberlain found Plaintiff to have the following occasional postural limitations, climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. p. 336). Ms. Chamberlain found Plaintiff to have manipulative limitations in handling and fingering, and no visual, communication, or environmental limitations.  (Tr. p. 337-338).  Dr. Chamberlain concluded that the "[a]lleged limitations cited in this RFC [Residual Functional Capacity] are due to an MDI [medically determinable impairment]; however, the severity and duration of symptoms in disproportionate to the expected severity and duration of symptoms for this MDI.  We find the claimant's alleged limitations are partially credible."  (Tr. p. 339).

---

7 Ms. Chamberlain's credentials were not provided.

On January 20, 2007, Plaintiff visited Stanley Rabinowitz, M.D., S.C. for a disability examination for the Florida Department of Health Office of Disability Determinations. (Tr. p. 342-348).  Plaintiff complained of joint and back pain and obsessive compulsive disorder and depression.  (Tr. p. 342).  Dr. Rabinowitz did find that a physical examination revealed a decreased range of motion of the cervical spine with pain but no paravertebral muscle spasms, and the range of motion testing otherwise was normal.   (Tr. p. 344).  Plaintiff was able to ambulate without an assistive device and gait and station were normal.  (Tr. p. 344).  Grip strength and digital dexterity were preserved.  (Tr. p. 344).  Dr. Rabinowitz noted that Plaintiff had no difficulty getting on and off the examining table or squatting, and her neurological examination was within normal limits.  (Tr. p. 344).  Dr. Rabinowitz noted that the Plaintiff had a history of obsessive compulsive disorder ("OCD") and depression and was taking psychotropic medication.  (Tr. p.. 344).  Dr. Rabinowitz found Plaintiff to be oriented, able to relate her history, dressed appropriately, and appeared able to manage her own funds.  (Tr. p. 344).  Dr. Rabinowitz's impression was that the OCD and depression had been treated.  (Tr. p. 344).

A Psychiatric Review Technique was completed on February 7, 2007, by Carol Deatrick, Ph.D.  (Tr. p. 349-362).  Dr. Deatrick  found Plaintiff's medical impairments not to be severe, and found she had affective disorders.  (Tr. p. 349).   Dr. Deatrick determined Plaintiff's medically determinable impairment to be MDD [major depressive disorder].  (Tr. p. 352).  Dr. Deatrick found Plaintiff to have mild degrees of limitation in restrictions of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, of an extended duration.  (Tr. p.359). Dr. Deatrick concluded that overall her medical evidence of record did not support significant limits due to her mental condition alone. (Tr. p. 361).

On February 8, 2007, Ronald Kline, M.D. completed a Physical Residual Functional Capacity Assessment.  (Tr. p. 363).  Dr. Kline determined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in push and/or pull using hand or foot controls.  (Tr. p. 364).  Dr. Kline found Plaintiff to have no postural, manipulative, visual communicative or environmental limitations.  (Tr. p. 365-367).  Dr. Kline found that Plaintiff's allegations "may be credible but appears capable of activities within the parameters of this RFC." (Tr. p. 368).

### E. Specific Issues

Plaintiff raises three issues on appeal.  As stated by Plaintiff, they are:  (1) the ALJ failed to properly address the evidence from Dr. Liebowitz as required upon remand by the United States District Court for the Middle District of Florida; (2) based on the ALJ's RFC assessment, vocational expert testimony was necessary at the hearing; and (3)  the ALJ's decision was not supported by substantial evidence.

### 1.  Whether the ALJ Failed to Properly Consider the Evidence Submitted by Dr. Liebowitz

Plaintiff asserts that the ALJ never discussed Dr. Liebowitz's Pain Interrogatories dated January 24, 2008, and failed to assign weight to the Motor Deficit Questionnaire completed by Dr. Liebowitz on March 2, 2007. (Tr. p. 394).   Plaintiff claims that this document supports the proposition that Plaintiff is more limited based on her physical impairments, and more limited than described in the ALJ's RFC assessment.   The Commissioner responds that the ALJ specifically addressed Dr. Liebowitz's opinion and explained the weight he gave to that opinion.

On remand, the Commissioner was to "evaluate the medical source opinions of record from treating source Dr. Liebowitz, specifically state the weight given to these opinions, and

specifically set forth the reasons for that weight." (Tr. p. 636).  An ALJ is required to consider all the relevant evidence of record in making a disability determination.  20 C.F.R. § 416.920. However, an ALJ is not required to discuss every piece of evidence submitted in rendering his decision. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (providing that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision" as a whole is supported by substantial evidence), *Clarence Bros. v. Astrue*, 2012 WL 3243232 (M.D. Fla. Aug. 8, 2012).  The Court cannot conduct a meaningful review "'if the ALJ does not state with sufficient clarity the rules being applied and the weight accorded the evidence considered.'"  *Clarence Bros.*, 2012 WL 3243232 at *7 (quoting *Ryan v. Heckler*, 762 F.2d 939, 941 (11th Cir. 1985)).

The ALJ noted that the Appeals Council directed him to "specifically state the weight given to these [the treating physician's] opinions and specifically set forth the reasons for the weight."  (Tr. p. 600).  The ALJ then discussed the March 2007 Motor Deficit Questionnaire completed by Dr. Liebowitz. Specifically, the ALJ cited the following findings by Dr. Liebowitz:

> No motor deficit in the lower extremities, 3/5 motor strength in the left upper extremity, 4/5 motor strength in the right upper extremity, 4/5 grip strength bilaterally, and limited ability to perform fine manipulation after several minutes at any one activity.  However, he also stated the claimant has 5/5 bilateral lower extremity strength, and normal gait and station.  He also noted that that [sic] the claimant can squat, walk on toes and walk on heels."

(Tr. p. 600).  The ALJ then determined that

> [t]he motor deficit questionnaire is inconsistent with the Physical Residual Functional Capacity Assessment that Dr. Liebowitz completed on January 24, 2008.  He indicated that the claimant can lift up to 10 pounds occasionally which indicates that the claimant has the residual function capacity to perform light work defined in 20 CFR 404.1567(b) and 416.976(b).  Dr. Liebowitz also indicated the claimant should never crawl, and never climb; and only occasionally bend or squat.  Dr. Liebowitz indicated that the claimant has no problems reaching; no problems using her hands for repetitive grasping, pushing, pulling or fin[e]

manipulation.   The claimant has no problems using her feet for repetitive movements as in operating foot controls (Exhibit 23F).

(Tr. p. 600-601).   The ALJ later states that he "specifically reject[s]" Dr. Liebowitz's opinion regarding the Plaintiff's ability as to work-related activities because the ALJ determined Dr. Liebowitz's opinions were not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence of record, referring specifically to the Plaintiff's own statements showing that she can do more than Dr. Liebowitz indicated.   (Tr. p. 601).   The ALJ also stated that he had evaluated "the medical source opinions of record from treating course, Dr. Liebowitz, as instructed by the [A]ppeals [C]oun[cil] and finds that even if it is found that the Physical Residual Functional Capacity Assessment that was completed by Dr. Liebowitz should be given more weight, there is still no evidence to substantiate a finding that the claimant is disabled." (Tr. p. 601).

The ALJ clearly, carefully considered Dr. Liebowitz's March 2007 Motor Deficit Questionnaire.  He explained he was discounting it because it was not supported by clinical and laboratory diagnostic tests and it was inconsistent with Plaintiff's own statements.  The ALJ specifically noted his direction from the Appeals Council as to the opinions of Dr. Liebowitz, and the ALJ painstakingly reviewed Dr. Liebowitz's March 2007 Motor Deficit Questionnaire as well as the other relevant evidence of record to determine that he would discount Dr. Liebowitz's findings.  The Court determines that the ALJ did not err and his determination was supported by substantial evidence.

The Plaintiff also asserts that the ALJ failed to mention the January 24, 2008 Pain Interrogatories.  (Tr. p. 394).  The ALJ did, however, evaluate in detail Dr. Liebowitz's Physical Capacity Evaluation also done on January 24, 2008. In that evaluation, Dr. Liebowitz determined

Plaintiff's ability to sit, stand, and walk, and the ALJ reviewed Dr. Liebowitz's opinion carefully but did not accept it.   Within Dr. Liebowitz's opinion as to Plaintiff's physical capacities, Dr. Liebowitz had to consider Plaintiff's pain complaints and her credibility as to pain to determine Plaintiff's ability to sit, stand, walk, lift, push, pull, bend, squat, crawl, and climb and other abilities.   The ALJ did not accept Dr. Liebowitz's opinion as to her capabilities to stand and sit in an eight hour day finding Dr. Liebowitz's opinions were not consistent with and supported by other medical evidence of record.   (Tr. p. 601).   He found that Dr. Liebowitz did not base his determinations on medically acceptable clinical or laboratory diagnostic techniques. (Tr. p. 601) The ALJ later noted that the Plaintiff appeared healthy at the hearing, and has normal activities of daily living including driving. (Tr. p. 601). Further, the ALJ found that Plaintiff was received mainly conservative treatment with pain management.  (Tr. p. 602).   Although the ALJ did not specifically mention Dr. Liebowitz's Pain Interrogatories, the ALJ did consider Dr. Liebowitz's opinion as a whole, and the Court finds that the ALJ did not err, and his opinion as to the weight of Dr. Liebowitz's opinion is support by substantial evidence.

### 2.   Whether Vocational Expert Testimony was Necessary at the Hearing

Plaintiff asserts that the ALJ erred in failing to obtain vocational expert testimony at the hearing.  The ALJ found Plaintiff has an RFC of light work, except that she should only lift/carry up to 10 pounds occasionally, needs a sit/stand option, and can only occasionally bend and squat, and never crawl or climb.  (Tr. p. 599).   The ALJ concluded that Plaintiff could return to her past relevant work as a clerical worker, as characterized by The Dictionary of Occupational Titles as sedentary, semiskilled.  (Tr. p. 602).

Plaintiff cites to cases regarding the ALJ's obligation to obtain vocational expert testimony if Plaintiff is unable to do a full range of work at a given level, or when a plaintiff has

non-exertional limitations. *See Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) and *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). In these cases, however, the analysis was performed at step five not at step four as in the instant case.

At step four, Plaintiff has the burden of proving the inability to perform her past relevant work. *Lucas v. Sullivan*, 818 F.2d 1567, 1571 (11th Cir. 1990). Plaintiff must show that she has the inability to do the type of work performed in the past, not just the specific job she held. *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986). An ALJ must consider all of the job duties of the past relevant work and evaluate a plaintiff's ability to perform those duties despite any impairment. *Lucas*, 918 F.2d at 1574 n. 3. Vocational expert testimony is not necessary to determine whether a plaintiff can perform past relevant work, but can be helpful. *Lucas*, 918 F.2d at 1573 n.2. Vocational expert testimony is not required at step four, and therefore, in the instant case the ALJ did not err in failing to obtain vocational expert testimony.

Plaintiff also asserts that the ALJ erred by not fully developing evidence of the physical and mental requirements of Plaintiff's past relevant work as a clerical worker. When determining if a plaintiff can perform her past relevant work, an ALJ must make findings regarding the physical and mental demands of a plaintiff's past work and compare those demands to the plaintiff's RFC. 20 C.F.R. § 416.690(b) and *Lucas v. Sullivan*, 918 F.2d 1567, 1573 n. 3 (11th Cir. 1990).

In the instant case, the ALJ states that Plaintiff can perform her past relevant work as a clerical worker which The Dictionary of Occupational ("DOT") titles classifies as sedentary, semiskilled. (Tr. p. 602). The ALJ failed to list the DOT number for clerical worker, and failed to include any of the job duties either physical or mental for this occupation. The ALJ concluded, "[I]n comparing the claimant's residual functional capacity with the physical and

mental demands of this work, the undersigned finds the claimant is able to perform it as actually and generally performed." (Tr. p. 602).   The ALJ found that Plaintiff could perform light work "except the claimant should only lift/carry up to 10 pounds occasionally, needs a sit/stand option, can only occasionally bend and squat, and can never crawl or climb." (Tr. p. 599).   Plaintiff cannot perform a full range of light work, and the ALJ failed to show that with these limitations, Plaintiff is able to perform clerical work. Therefore, the ALJ erred in not setting forth the physical and mental job duties of a clerical worker, and the Court is unable to meaningfully review the ALJ's decision that Plaintiff can return to her past relevant work.[8]

### 3.  Whether the ALJ's Decision is Supported by Substantial Evidence

Plaintiff argues that the ALJ erred in not finding that Plaintiff's mental impairments were severe at step two. "Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir.2010); see *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir.1987) (recognizing that "the finding of any severe impairment ... whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" is sufficient to satisfy step two). When an ALJ fails to consider a specific impairment severe at step two, such error is harmless if "the ALJ considered all of [the] impairments in combination at later steps in the evaluation process." *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 903 (11th Cir. 2011); see *Heatly*, 382 F. App'x at 825 (stating that an "ALJ is required to demonstrate that he has considered all of the claimant's impairments, whether severe or not, in combination"); *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir.1984) (finding that an ALJ must make "specific and well-articulated findings as to the effect of the combination of impairments"). In the instant case, the

---

8 The ALJ included analysis at the end of his opinion which appears to be a Step 5 analysis but is not clearly set forth. The ALJ did not include any specific jobs, job requirements, or how Plaintiff would be able to perform any job with her limitations, and the Court is unable to perform a meaningful review of this analysis.

ALJ determined that Plaintiff had the following severe impairment:  disorders of the back, status post cervical fusion, with diagnosis of cervical fusion syndrome and cervical facet syndrome. (Tr. p. 597).  Plaintiff argues that her depression is a severe impairment, and the ALJ erred by failing to list it as a severe impairment.

The ALJ considered Plaintiff's depression in his findings.  He specifically discussed Dr. Bernard's evaluation of Plaintiff and reviewed her activities of daily living.  The ALJ considered all of Plaintiff's impairments whether severe or not in combination, and the ALJ determined that Plaintiff's mental impairments cause no more than a mild limitation in three function areas and there were no episodes of decompensation in the fourth area, concluding that her mental impairments were not severe. *See* 20 C.F.R. § 404.1520a(c)(3).  Even if the ALJ failed to list Plaintiff's mental impairment as severe, this failure is harmless because the ALJ addressed in combination all of Plaintiff's impairments whether listed as severe or not.  The Court finds that the ALJ did not err or if he did err it was harmless error in failing to list Plaintiff's mental impairment of depression as severe.

### 4.   Whether the ALJ's RFC Assessment is Based on Substantial Evidence

Plaintiff argues that the ALJ erred by failing to include depression as a severe impairment and failing to consider depression in assessing Plaintiff's RFC.  The ALJ considered Dr. Bernard's evaluation in his decision, although Plaintiff cites to Dr. Bernard's records, he fails to note that Dr. Bernard found Plaintiff's thought processes were rational, clear, and logical; her mood was stable and appropriate without the use of antidepressants; her insight, intelligence, and judgment were probably average;   she was well oriented for time and place and has no indications of cognitive dysfunction.  The burden is on Plaintiff at step four to show her inability to perform her past relevant work. *Hines-Sharp v. Comm'r of Soc. Sec.* 2013 WL 811968, n. 2

(11th Cir. Mar. 6, 2013).  Based upon a review of Dr. Bernard's records, the Court does not find that the ALJ erred in determining that Plaintiff had only mild limitations relating to her mental impairment.  Plaintiff has failed to show how her diagnosis of depression will limit her work-related activities.   Therefore, Plaintiff has not met her burden, and the ALJ's opinion as to her mental impairment is supported by substantial evidence.

**IT IS RESPECTFULLY RECOMMEDED:**

That the decision of the Commissioner be **REVERSED** and the matter be **REMANDED** to the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g) for the sole issue of having the Commissioner develop the record and set forth factual findings as to the demands of Plaintiff's past relevant work as a clerical worker and Plaintiff's ability to perform her past relevant work with her limitations.  If necessary, the Commission may proceed to Step 5 of the sequential evaluation process and obtain the assistance of a vocational expert. In all other respects, it is recommended that the decision of the Commissioner be **AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida on August 19, 2013.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties